UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 13-20333-CIV-GOODMAN

JEAN ANN KRAMERMAN,

Plaintiff,

vs.

CAROLYN W. COLVIN
Acting Commissioner of Social Security
Administration,[1]

Defendant.
_____/

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This Cause is before the Undersigned on cross-motions for summary judgment by Plaintiff Jean Ann Kramerman ("Kramerman") [ECF No. 20], and Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration (the "Commissioner") [ECF No. 21].

An Administrative Law Judge (the "ALJ") determined that Kramerman was not disabled. Kramerman seeks judicial review of the ALJ's decision, arguing that (1) the

---

[1]   Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Under Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  Section 405(g) of the Social Security Act specifically allows Social Security appeals cases to continue when there is a change in Commissioners.  42 U.S.C. § 405(g).

ALJ committed reversible error in failing to properly consider Kramerman's medically determinable impairment of vulvodynia and in purportedly requiring medical findings that do not exist with this type of impairment; (2) the ALJ committed reversible error in failing to set forth the requisite good cause for rejecting the opinion of Dr. Perry, a treating physician; and (3) the ALJ committed reversible error in failing to properly assess Kramerman's subjective complaints and credibility. [ECF No. 20, p. 1].

For the reasons outlined below, the Undersigned finds that the ALJ applied the proper legal standards in making his decision and that substantial evidence supports the ALJ's determination that Kramerman is not disabled. Accordingly, the Undersigned **affirms** the Commissioner's decision, **denies** Kramerman's summary judgment motion [ECF No. 20], **grants** the Commissioner's summary judgment motion [ECF No. 21], and the Clerk of the Court is directed to enter **final judgment** in favor of the Commissioner.

## I.   BACKGROUND

### A.  <u>Procedural History</u>

Kramerman filed an application for Supplemental Security Income disability benefits on August 12, 2010, alleging disability beginning August 29, 2007 due to vulvodynia vestibulitis[2] and chronic pain. (R. 136-39, 144, 166, 170, 183-85).[3]

Her application was denied initially by the state agency and then, upon reconsideration, denied again. (R. 32-35). Kramerman then requested a hearing before an ALJ to review her claim. The ALJ held that hearing on May 31, 2012, and issued his written decision on June 21, 2012. (R. 16-34). The ALJ found that Kramerman's vulvodynia is a severe impairment, but that she has the residual functional capacity ("RFC") to perform light exertional work, which allows her to perform her past relevant work ("PRW") as a medical office coordinator. (R. 17-27).

The ALJ also found Kramerman's allegations that the condition caused disabling symptoms "not credible to the extent they are inconsistent with" the RFC determination. In reaching this conclusion, the ALJ noted that her disability claim was

---

[2]      Vulvodynia is chronic pain or discomfort of the vulva. It is usually described as a burning, stinging, irritation, or rawness. Vulvar vestibulitis is vulvodynia that occurs in the vestibular region of the vulva, or the entry point to the vagina. "Vulvodynia: Condition Information," National Institution of Child Health and Human Development ("NICHD"), http://www.nichd.nih.gov/health/topics/vulvodynia/conditioninfo/Pages/default.aspx (last visited February 27, 2015).

[3]      References to "R. _" are to pages of the transcript of the administrative record.

based on her subjective complaints, but medical records did not reveal the "type of significant abnormalities one would expect if the claimant were in fact disabled," and because Kramerman "has an idiopathic condition." (R. 22, 24). The ALJ gave little weight to the opinions of Dr. Perry, one of Kramerman's treating physicians, and afforded "great weight" to the November 2010 RFC assessment of a non-examining State agency physician. (R. 25, 26).

Kramerman  requested review of the ALJ's decision in June 2012. (R. 115, 205-43). The Appeals Council denied that request via a Notice issued on December 14, 2012, making it the final decision of the Commissioner. (R. 1-5).

Kramerman then filed this action seeking judicial review of the Commissioner's decision. [ECF No. 1]. The Commissioner answered. [ECF No. 9]. Kramerman filed her summary judgment motion and the Commissioner filed a competing summary judgment motion, which also doubled as a response to Kramerman's summary judgment motion. [ECF Nos. 20; 21; 22]. Kramerman then responded to the Commissioner's competing summary judgment motion. [ECF No. 23]. This matter is now ripe for review.

B.  <u>**Factual Background**</u>

From 1996 to 2007, Kramerman worked as a medical office coordinator. (R. 145). She dates her vulvar and periurethral pain to 2006. (R. 249, 257). Kramerman also has a history of recurrent  herpes and urinary tract infections. (R. 247, 380, 383). Kramerman

sought treatment from OB/GYN Dr. Gregory A. Skipitis in 2007, and then from his partner, OB/GYN Dr. Thomas Perry, in 2008. (R. 380-87, 465-66).

On March 24, 2008, Dr. Perry reported that Plaintiff had "extreme vestibulitis pain" and an "atrophic looking vaginal area." (R. 380). Plaintiff reported that she did not have pain all the time with intercourse, but she sometimes had pain around the urethra and around the Skene glands. (R. 380-81). Dr. Perry diagnosed Kramerman with, among other things, vestibulitis and chronic vulvitis and prescribed Timovate gel and Celexa, an antidepressant. (R. 381). Dr. Perry also noted that all of Kramerman's previous doctors "have given her a diagnosis of vulva dinea." (R. 380).

On March 28, 2008, Dr. Perry noted that Plaintiff's vulva was nontender, but there was some "periurethra tenderness to point touch" and some areas on her urethra that were "somewhat tender." (R. 382). Dr. Perry stated that Plaintiff's vestibule was "exquisitely tender and that just touching it with a Q-tip made her jump off the table." (*Id.*). Plaintiff followed-up with Dr. Perry through December 2008 for vaginal pain, urinary tract infections, and herpes management. (R. 373-79). On June 17, 2008, Dr. Perry opined that Plaintiff had disabling vulvodynia and that multiple medications and modalities had failed her, except for topical creams, ice therapy, and sitz baths in cool water. (R. 375).

On August 8, 2008, at Dr. Perry's request, Deborah D. Kamali, M.D., evaluated Kramerman. (R. 257). Dr. Kamali reported that Plaintiff's "vulvar exam [was] notable

for normal structures; that is, she [did] not have any loss of vulvar architecture." (R. 258). Kramerman had normal sensation on the Q-tip examination administered by Dr. Kamali and did not have marked vestibular gland tenderness. (R. 258). She also did not have pelvic floor muscle spasm or pain in her pelvic floor muscles. (*Id*.). Dr. Kamali's assessment was that Plaintiff had vulvodynia, but not of the vestibulodynia type. (*Id*.). She recommended an estrogen vaginal ring and frequent application of bland emollients. (R. 258).

Between December 2008 and June 2009, Jerome M. Weiss, M.D., treated Plaintiff for vulvodynia by administering a series of pudendal nerve blocks. (R. 262-83). Dr. Weiss noted that Plaintiff had some days of improvement following the nerve blocks, but that the pain relief was only temporary. (R. 262, 264, 266, 268, 270, 272). He also noted that Kramerman's pain level "fluctuates," with both good and painful days. (R. 266).

Kramerman engaged in pelvic floor therapy with Brande Moffatt, M.P.T., between January and May 2009, on referral from Dr. Weiss. (R. 310-14, 358-59). In February 2009, Kramerman reported to Ms. Moffatt that her symptoms had decreased with 50% improvement during the daytime and approximately 30% improvement at night, with occasional flare-ups of "10+ burning vaginal pain." (R. 310). At that time, Kramerman described her episodes as intermittent, not chronic. (*Id*.). In her last report in May 2009, Ms. Moffatt reported that Kramerman had consistent improvement up

until the week of April 15, 2009, but that Plaintiff reported a large increase in her symptoms around that time. (R. 358). Ms. Moffatt noted that over the previous month, Plaintiff had significantly reduced her physical therapy treatments, and that she had started a new medication, Premarin, during that month as well. (R. 358-59).

Dr. Perry continued to see Kramerman intermittently between January 2009 and May 2009. (R. 370-72). In January 2009, he noted Kramerman was doing well on Effexor and Valtrex and that she had some positive results with the nerve block injections. (R. 372). In April 2009, Plaintiff reported that her vulvodynia treatment was "working now" and that she did not have to take Vicodin often. (R. 371). In contrast to the information provided by Ms. Moffet, in May 2009, Dr. Perry stated that Plaintiff's vulvodynia was "stable" with Ms. Moffatt and Dr. Weiss. (R. 370).

In February 2010, Stephanie A. Prendergast, M.P.T., a physical therapist, reported that Plaintiff had de-estrogenized vulvar tissue and poor connective tissue integrity in her peri-urethral region. However, Ms. Prenergast did not believe Kramerman had vulvodynia or pudendal neuralgia. (R. 353). Ms. Prendergast opined that Kramerman would benefit from regulation of her hormone levels. (R. 353). Ms. Prendergast also noted that while Dr. Perry diagnosed Kramerman with vulvodynia, Drs. Kamali and Joanna Badger did not think that Kramerman had vulvodynia. (R. 352).

Between February 2010 and October 2010, Ricki Pollycove, M.D., treated Kramerman for her vulvodynia as well. (R. 285-87, 322-23). Dr. Pollycove prescribed several medications for treatment, including estrogen. (R. 316-18).

On April 1, 2010, an ultrasound of Kramerman's pelvis revealed an adnexal mass/cyst on her left ovary. (R. 293). On April 15, 2010, Dr. Pollycove referred Kramerman to Andrew J. Brill, M.D., a gynecological surgeon, for evaluation. (R. 303-04). Dr. Brill noted that Kramerman had no significant chronic pelvic pain or pelvic pressure. (R. 303). Dr. Brill reported that Kramerman's external genitalia were normal. (R. 304). Her vaginal vault was also clear and relatively well supported. (R. 304). Her rectovaginal exam confirmed a cystic left adnexal mass. (*Id.*).

On April 16, 2010, Kramerman returned to Dr. Perry complaining of vaginal pain (R. 368). She had vaginitis, which was treated, and she then reported she was feeling better. (*Id.*).

On June 8, 2010, Dr. Brill performed a laparoscopic excision of endometriosis and excision of Kramerman's left ovarian cyst. (R. 411). On June 23, 2010, Dr. Perry reported that Kramerman was doing well with "min problems," following that surgery. (R. 366). Dr. Perry also noted that Kramerman's vulvodynia was still a problem and that she was receiving treatment from Dr. Pollycove. (R. 366). Dr. Perry's notes show that Kramerman was going to move to Florida around this time too. (R. 366).

8

On November 19, 2010, David L. Hicks, M.D., a State agency medical consultant, reviewed the record and determined that Kramerman had chronic vulvodynia and chronic pain. (R. 418, 425). However, Dr. Hicks opined that, notwithstanding these impairments, Kramerman was capable of performing a full range of light work (R. 419-22, 425).

On November 29, 2010, Dr. Perry wrote a letter to Kramerman's counsel in support of her disability application. (R. 427). Dr. Perry stated that Kramerman had extreme idiopathic vulvodynia which made her unable to work, unable to perform routine functions around the house, and caused her extreme pain. (*Id*.). Dr. Perry noted that Kramerman took multiple medications and therapies, but the only treatment that worked for her was ice therapy performed three to four times a day. (*Id*.). Dr. Perry recommended that Kramerman be granted complete disability. (*Id*.). According to Dr. Perry's letter, Kramerman had been his patient since 2002. (R. 427). However, in a 2012 sworn statement Dr. Perry provided to Kramerman's counsel in support of her disability application, he stated that he first saw Kramerman in 2008. (R. 466).

After Kramerman moved to Florida, she initially went to Amanda M. Richards-Bullock, M.D., for a June 11, 2011 gynecological examination. (R. 433). On July 21, 2011, Dr. Richards-Bullock reported that Plaintiff had no erythema, tenderness, or bleeding around her vagina. (R. 435). Her vulva appeared normal. (R. 436). Her periurethra and

hymen were erythematous and swollen and she had a positive Q-tip test on the vaginal examination. (R. 436). Her examination revealed no other issues. (R. 435-36).

Dr. Richards-Bullock prescribed an estrogen/progesterone cream for treatment and renewed Kramerman's request for Vicodin. (R. 436). On September 8, 2011, Kramerman complained of panic attacks and urine leakage to Dr. Richards-Bullock. (R. 443). However, no abnormalities were found on the urodynamic test for urinary incontinence. (R. 443).

On January 17, 2012, Kramerman changed physicians to Peter M. Dayton, M.D., another OB/GYN. (R. 458). Kramerman's physical examination was mostly normal. (R. 460-61). Kramerman described vulvar burning of the vestibule, which Dr. Dayton noted appeared normal. (R. 461). Kramerman's vagina was normal without lesions or masses. (R. 461). Dr. Dayton diagnosed Kramerman with, among other things, vulvodynia, and referred her to a vulvodynia clinic for further evaluation and treatment. (R. 461). Dr. Dayton prescribed several medications, including progesterone, Valtrex, and Vicodin. (R. 462).

On March 7, 2012, Kramerman returned to Dr. Dayton complaining of vaginal irritation and pain. (R. 453). Dr. Dayton noted that Kramerman had moderate to severe atrophy at that time and that there was a small ulcer in her urethral area. (R. 454). Her vagina was otherwise normal without lesions or masses. (R. 454). Dr. Dayton added estrogen to Kramerman's medication regimen. (R. 454). On April 3, 2012, Kramerman

returned with continued complaints of vulvar pain, but she described it as episodic occurring in the early morning. (R. 448). According to Dr. Dayton's notes, Kramerman's intravaginal symptoms improved with the addition of estrogen replacement therapy. (R. 448). On examination, Kramerman's external genitalia appeared normal with no ulcerative lesions or discolorations. (R. 449). She had some tenderness over her urethral areas. (R. 449). Her vaginal vault, otherwise, showed improvement. (R. 449). Dr. Dayton added Lyrica and Trazodone to Kramerman's regimen. (R. 449).

In a follow-up examination with Dr. Dayton on May 1, 2012, Kramerman reported that her condition had improved and that her outbreaks of vulvodynia were less often. (R.  445). She stated that she had had a couple of outbreaks over the last several weeks. (*Id*.). Dr. Dayton opined that Kramerman had shown a greater than 50% improvement with Lyrica, even though he had predicted there would only be a 20% improvement a month previously. (R. 445, 449). He recommended an increase in the dosage of Lyrica and instructed Kramerman to follow-up in six months. (R. 446).

As referenced, on May 21, 2012, Dr. Perry provided a telephonic sworn statement to Kramerman's counsel. (R. 463-73). Dr. Perry stated that he last saw Kramerman on February 1, 2011, more than a year earlier. (R. 466).

Dr. Perry testified that his diagnosis of Kramerman's medical condition was severe vulvodynia and that it was a dysfunctional disease. (R. 467). Dr. Perry opined that Kramerman would not be able to perform sedentary work and that she would need

to spend a good part of her day in and out of the bathroom putting ice on her vulva. (R. 471). He acknowledged that Kramerman's vulvodynia was on a continuum, and that on some days she would be more functional (R. 471).

## II.    APPLICABLE LEGAL PRINCIPLES

### A.    <u>Standard of Review</u>

In reviewing the Commissioner's final decision, the Court's role is limited to determining whether there is substantial evidence in the record to support the decision and whether the Commissioner correctly applied the appropriate legal standards. 42 U.S.C. § 405(g); *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

The Commissioner's decision must be affirmed if it is supported by substantial evidence in the record. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (internal citations omitted). Substantial evidence is more than a scintilla, but less than a preponderance; "it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McRoberts*, 841 F.2d at 1080 (internal citations and quotations omitted). In determining whether substantial evidence exists, the Court must scrutinize the record in its entirety, taking into account both favorable and unfavorable evidence. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (internal citation omitted). The Court, however, must not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239

(internal citations omitted). Thus, "[e]ven if [the court] find[s] that the evidence preponderates against the [Commissioner's] decision, [the court] must affirm if the decision is supported by substantial evidence." *Id*.

Unlike the deferential standard of review applied to the Commissioner's findings of fact, "[n]o presumption of validity attaches to the [Commissioner's] determination of the proper legal standards to be applied in evaluating claims." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Wiggins*, 679 F.2d at 1389). The Commissioner's "[f]ailure to apply the correct legal standards or to provide the reviewing court with the sufficient basis to determine that the correct legal principles have been followed is grounds for reversal." *Wiggins*, 679 F.2d at 1389.

## B.  The Sequential Evaluation

The Commissioner must undertake a five-step sequential analysis to determine whether a plaintiff is disabled. The Commissioner must first determine whether the plaintiff is currently engaged in substantial gainful activity. If the plaintiff is engaged in substantial gainful activity, then he or she is not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b). In the second step, the Commissioner must determine whether the plaintiff suffers from a severe impairment or combination of impairments -- at least one such impairment is necessary in order for the disability analysis to continue. 20 C.F.R. §§ 404.1520(c), 416.920(c). At step three, the Commissioner determines whether the plaintiff's impairments meet or equal a listed impairment under 20 C.F.R. §§ 404, App.

1, 404.1520(d), 416.920(d).[4] If so, then the plaintiff is considered disabled; if not, then the analysis proceeds to step four. At step four, the Commissioner must determine whether the plaintiff's impairments prevent the plaintiff from performing his or her past relevant work. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  If the answer is no, then the plaintiff is not disabled. If the answer is yes, then a prima facie case of disability is established. The burden then shifts to the Commissioner to show, at step five, that there is other work that the plaintiff can perform. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); 20 C.F.R. § 404.1560(c).  The Commissioner must then determine whether the plaintiff is actually capable of performing other work within the economy. 20 C.F.R. §§ 404.1520(g), 416.920(g).  The following flow chart illustrates the five-step sequential analysis.

---

[4]      "Certain impairments are so severe either when considered alone or in conjunction with other impairments that, if such impairments are proved, the regulations require a finding of disability without further inquiry into the [plaintiff's] ability to work." *Gibson v. Heckler*, 762 F.2d 1516, 1518 (11th Cir. 1985).



III.   **ANALYSIS**

The Undersigned addresses each of Kramerman's three arguments in turn below.

A.   **The ALJ did not fail to properly consider Kramerman's medically determinable impairment of Vulvodynia.**

Kramerman first argues that the ALJ committed reversible error in failing to properly consider her medically determinable impairment of vulvodynia and in requiring medical findings that do not exist with this type of impairment.

As Kramerman acknowledges, the ALJ *did* find that her vulvodynia is a severe impairment. [ECF No. 20, p. 10 (citing R. 22)]. Then, at Step 3 of the 5-step sequential analysis, the ALJ determined that Kramerman's impairment or combination of impairments did not meet or medically equal the severity of a listed impairment. Following that determination, the ALJ made an RFC determination and decided Karmerman's impairments do not prevent her from completing her PRW as a medical office coordinator. (R. 22-27).

Kramerman takes issue with the ALJ's statements in his written opinion that medical records fail to reveal the abnormalities one would expect if she was disabled, that she suffers from a condition with no known cause, and that her disability claim is based on her subjective complaints. [ECF No. 20, p. 10]. Following these statements, the ALJ made a standard credibility determination:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's

16

statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.[5]

(R. 24).

According to Kramerman, the "ALJ committed reversible error in requiring laboratory findings as the 'regulations do not require that a disability impairment be proven by laboratory findings.'" [ECF No. 20, p. 11 (quoting *Ortega v. Chater*. 933 F. Supp. 1071, 1076 (S.D. Fla. 1996)].

However, that is not what occurred here. Instead, the ALJ substantively analyzed information provided by Drs. Robert Hansen, Andrew Brill, Peter Dayton, and Thomas Perry in crafting his RFC determination. The ALJ specifically found that the medical records "fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled." (R. 24). But that was not the end of his analysis.

---

[5]     This is formulaic language, and it appears in **many** of the disability determinations this Court has reviewed. But, it is also followed by extensive analysis for the ALJ's credibility determination, as described more fully in section C below. Courts in this Circuit have remanded disability determination cases only when the boilerplate language on a claimant's credibility is *not* followed by actual analysis. *See, e.g., Howell v. Astrue*, 8:10-CV-2175-T-26TGW, 2011 WL 4002557, at *3 (M.D. Fla. Aug. 16, 2011) report and recommendation adopted, 8:10-CV-2175-T-26TGW, 2011 WL 3878365 (M.D. Fla. Sept. 2, 2011) ("This type of boilerplate language is regularly seen in Social Security cases. However, it is usually followed by a more detailed explanation. When it is not, I have reversed, or recommended reversal, due to an inadequate credibility determination."); *Peart v. Commr. of Soc. Sec.,* 6:13-CV-287-ORL-GJK, 2014 WL 1207362, at *3 (M.D. Fla. Mar. 24, 2014) (remanding because boilerplate language was not followed by actual analysis). In Kramerman's case, the ALJ did provide the requisite analysis.

The ALJ then noted that Kramerman's disability claim is "based on her subjective complaints." (*Id.*). The ALJ did not find that *this* somehow precluded a disability finding. Instead, he analyzed Kramerman's testimony and found that it was inconsistent with her disability claim. In short, the ALJ *did* consider Kramerman's subjective complaints and testimony, but because that information was inconsistent with her alleged disability (and because the ALJ did not find Kramerman's testimony credible),[6] he ultimately rejected her disability claim. The ALJ did *not* reject Kramerman's disability claim because he thought it **had** to be substantiated by laboratory findings. He simply noted that those findings -- and Kramerman's own testimony -- were inconsistent with her disability claim. This is not reversible error.

Kramerman's first argument lacks merit. The ALJ did not deny her disability claim based on an erroneous requirement that she support the claim with laboratory findings. The ALJ properly evaluated the medical evidence, including Kramerman's own testimony, and determined that, while her vulvodynia was a severe impairment, Kramerman maintained the RFC to perform her PRW as a medical office coordinator.

---

[6]     Credibility determinations about a claimant's subjective testimony are reserved for the ALJ. *Lanier v. Comm'r of Soc. Sec.*, 252 F. App'x 311, 314 (11th Cir. 2007) (unpublished) (citing *Johns v. Bowen,* 821 F.2d 551, 557 (11th Cir. 1987)). Where an ALJ decides not to credit a claimant's testimony, he or she "must articulate explicit and adequate reasons for doing so." *Id.* (quoting *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991)). The ALJ's credibility determination is discussed below at section C.

**B.** **The ALJ did not commit reversible error in failing to set forth the requisite good cause for rejecting the opinion of Thomas Perry, MD., Kramerman's treating Ob-Gyn.**

The ALJ accorded "little weight" to the opinion of treating physician Dr. Thomas J. Perry, M.D. (R. 25).

The regulations governing social security disability determinations allow an ALJ to consider many factors in evaluating medical opinions, including the examining relationship, the treatment relationship, whether the opinion is amply supported, and whether the opinion is consistent with the record and the doctor's specialization. 20 C.F.R. §§ 404.1527(d), 416.927(d). "Generally, the opinions of examining physicians are given more weight than non-examining physicians[, and] the opinions of treating physicians are given more weight than non-treating physicians." *Kelly v. Comm'r of Soc. Sec.*, 401 F. App'x 403, 407 (11th Cir. 2010) (citing §§ 404.1527(d)(1)–(2), 416.927(d)(1)–(2)). "A doctor's opinion on a dispositive issue reserved for the Commissioner, such as whether the claimant is 'disabled' or 'unable to work,' is not considered a medical opinion and is not given any special significance, even if offered by a treating source, but will be taken into consideration." *Id.* (citing §§ 404.1527(e), 416.927(e)); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) ("we are concerned here with the doctors' evaluations of Lewis's condition and the medical consequences thereof, not their opinions of the legal consequences of his condition").

Opinions of treating physicians must be given "substantial or considerable weight" unless good cause is shown to the contrary. *Lewis,* 125 F.3d at 1440. In the Eleventh Circuit, good cause "exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (internal citations omitted). "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate [her] reasons." *Id.* (internal citations omitted).

The record includes Dr. Perry's treatment notes, as well as two medical opinions. The medical opinions include a letter dated November 29, 2010, opining that Kramerman was "completely disabled," and a sworn statement dated May 12, 2012, opining that severe limitations from Kramerman's vulvodynia prevented her from performing even sedentary work. (R. 427, 463-72). This latter statement was given by telephone, to Kramerman's attorney, more than a year after Dr. Perry had last seen Kramerman. (R. 466).

Kramerman argues that the ALJ selectively cited from the evidence and that his conclusion that Dr. Perry's opinion is supported by neither his own treatment notes nor those of other treating physicians is incorrect. [ECF No. 20, pp. 14-15]. However, a review of the record and the ALJ's opinion shows that the ALJ's decision to accord little weight to Dr. Perry's opinion *is* supported by substantial evidence.

At the outset, it should be highlighted again that whether Kramerman is disabled is a legal conclusion reserved for the SSA, not a treating physician, and so the ALJ did not need to afford any particular deference to Dr. Perry's legal conclusion that Kramerman was "completely disabled." *Lewis,* 125 F.3d at 1440.

This issue aside, the ALJ's analysis shows that, in his view, Dr. Perry's treatment notes did not support Dr. Perry's opinion that Kramerman had extreme limitations, including an inability to do even sedentary work due to the pain caused by her vulvodynia. (R. 25-26). The ALJ noted that Kramerman's condition, and the concomitant pain associated with it, showed intermittent exacerbations of symptoms as well as periods of marked improvement.

For instance, a January 2009 treatment note from Dr. Perry indicated that her medications were "doing well," and that Kramerman was "undergoing injections at this time with some results." (R. 372). A treatment note from April 16, 2010 noted that Kramerman "had a positive Gardnerella vaginitis and was treated and symptoms are gone. She is feeling better." (R. 368). A December 15, 2008 treatment note indicated that "worsening problems [with] vulvodynia [and] current meds not working," but a May 26, 2009 treatment note stated "vulvodynia stable." (R. 370. 374). An April 9, 2008 treatment note indicated a vulvodynia medication is "working well." (R. 379). And an April 17, 2009 treatment note stated "vulvodynia treatment working now," and "finally some relief." (R. 371).

21

Again, good cause exists to give little or no weight to the opinion of a treating physician when the "treating physician's opinion was . . . inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1240-41. The ALJ's decision to give little weight to Dr. Perry's opinion was in part based on the opinion's inconsistency with the doctor's own medical records. It may be that Dr. Perry's treatment notes would also evidence his opinion that Kramerman had extreme limitations, but it is not for the Undersigned to reweigh the evidence, and the ALJ's decision on this point is supported by ample evidence in the record. *See Bloodsworth*, 703 F.2d at 1239 (the Court must not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]").

In addition, the ALJ grounded his decision to afford little weight to the opinion of Dr. Perry on the inconsistent opinions of other treating physicians, particularly that of Dr. Dayton. Dr. Dayton treated Kramerman after Dr. Perry (after Kramerman had moved to Florida). Kramerman told Dr. Dayton on May 14, 2012 that she had improved, and he noted that her "outbreaks of vuvlodynia [are] less often." (R. 445). Dr. Dayton's treatment notes also support the ALJ's assertion that "progress notes indicated that the claimant had intermittent exacerbations, but was also intermittently symptom free with treatment." (R. 25).

For instance, Dr. Dayton noted in March 2012 that Kramerman had moderate to severe vulvar atrophy and a small urethral ulcer, but by April 2012, just a month later,

Dr. Dayton saw "no ulcerative lesions," and the "[v]aginal vault show[ed] improved estrogen with good rugae." (R. 449). Finally, while Dr. Dayton had told Kramerman in April 2012 that she should expect only a 20% improvement in her vulvodynia using a new medication (Lyrica), by May 2012 (a month later) Kramerman reported a **50%** improvement. (R. 446, 449). This constitutes sufficient evidence to support the ALJ's decision to give little weight to Dr. Perry's opinion.

Kramerman also argues that the opinion of State agency medical consultants cannot, as a matter of law, constitute the substantial evidence necessary to rebut the opinions of a treating physician such as Dr. Perry. [ECF No. 20, pp. 15-16]. This is an accurate statement of the law. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (internal citation omitted). However, this is not what occurred in Kramerman's case. The ALJ's decision to give Dr. Perry's opinion little weight was not based solely on his decision to give the opinion of the State agency medical consultants more weight. Instead, it was based on a review of the entire record, including a thorough analysis of Dr. Perry's own treatment notes, as well as those of other treating physicians, as described above.

The ALJ's RFC determination was not based exclusively on the opinion of the State agency medical consultants either. The ALJ's RFC determination is bolstered by three-and-a-half single-spaced pages of analysis, including analysis of Kramerman's testimony, notes from a variety of treating physicians, and evaluation of the record as a whole. (R. 23-26).

### C. **The ALJ did not fail to properly assess Kramerman's subjective complaints and credibility.**

In her third and final argument, Kramerman argues that the ALJ "misstated the record in several key respects such that his credibility finding cannot be supported by substantial evidence." [ECF No. 20, p. 16]. Essentially, Kramerman believes that accepting her "improperly rejected testimony as true, it is apparent that she cannot perform sustained work activities and is disabled." [*Id.*].

Credibility determinations about a claimant's subjective testimony are reserved for the ALJ. *Lanier v. Comm'r of Soc. Sec.*, 252 F. App'x 311, 314 (11th Cir. 2007) (citing *Johns v. Bowen*, 821 F.2d 551, 557 (11th Cir. 1987)). Where an ALJ decides not to credit a claimant's testimony, he or she "must articulate explicit and adequate reasons for doing so." *Id.* (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). The 11th Circuit has "'established a three part "pain standard" that applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms.'" *Id.* (quoting *Holt*, 921 F.2d 1221 at 1223).

The standard requires:

1) Evidence of an underlying medical condition, and either

2) Objective medical evidence that confirms the severity of the alleged pain arising from the condition, or

3) That the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

24

*Id.*

The ALJ may consider a claimant's daily activities when evaluating her complaints of pain. *Id.* (citing 20 C.F.R. § 404.1529(c)(3)). Finally, a claimant's subjective complaints alone cannot establish disability. 20 C.F.R. § 416.929(a).

Kramerman takes specific issue with three of the ALJ's findings. Each is discussed in turn below.

First, Kramerman takes issue with the ALJ's finding that her medical records document that she had "intermittent exacerbations, but was also intermittently symptom free with treatment." [ECF No. 20, p. 17]. Kramerman argues the ALJ's findings are not supported by substantial evidence, but in fact they are. The ALJ relied in part on certain treatment notes from Dr. Dayton, a treating physician, to reach this conclusion. [*Id.*]. Each of the statements that the ALJ attributes to Dr. Dayton is in the record. (R. 445- 48). These statements show that in May 2012, Kramerman's symptoms had improved, and, in the words of Dr. Dayton, "[h]er outbreaks of vulvodynia [are] less often." (R. 445). And according to Dr. Dayton, as of May 1, 2012, Kramerman had only had a few outbreaks in recent weeks, evidencing the ALJ's assertion that at times she is symptom free. (R. 445). Dr. Dayton's treatment notes *do* support the ALJ's findings.

Kramerman believes that Dr. Dayton's treatment notes, at best, evidence occasional improvement in her condition, and cannot support a finding that she could

sustain work activities. But, that is *her* appraisal of the record. The ALJ's appraisal -- that Kramerman's condition did not preclude her from performing her PRW as a medical office coordinator -- is supported by the record. The ALJ carefully pointed to (and cited) the record evidence supporting his RFC determination. It is not this Court's role to "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239 (internal citations omitted). Even if the record evidence preponderates *for* a disability finding, that is not enough for Kramerman to meet her burden in this proceeding. Substantial evidence is only enough "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McRoberts*, 841 F.2d at 1080 (internal citations and quotations omitted). The ALJ clearly met that standard here.

Kramerman also takes issue with the ALJ's finding that her daily activities are "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations" such that "her functional limitations are self-imposed." [ECF No. 20, p. 18]. These findings were part of the ALJ's credibility determination. The ALJ noted that Kramerman "reported that she prepares meals, does laundry, washes dishes, makes the bed, drives, and shops." (R. 25). The ALJ thought this information was inconsistent with Kramerman's testimony indicating "marked restriction of even simple daily activities." (*Id.*). Ultimately, the ALJ found that, "[c]onsidering the claimant's subjective allegations against the objective medical evidence and other

relevant information bearing on the issue of credibility, the undersigned must conclude that her functional limitations are self-imposed. Therefore the claimant's subjective allegations must be rejected as lacking credibility." (*Id.*).

Kramerman contends that the ALJ, in reaching this conclusion, mischaracterized the evidence. Her meal preparation, as indicated on her Function Report, is limited to making sandwiches or using the microwave. (R. 167). Her household chores are very few. (*Id.*). Kramerman stated on her Function Report that she only drives once or twice a month, for one-half hour to an hour. (R. 168). Kramerman's hearing testimony essentially corroborates the information found in her Function Report. (R. 40-45).

The problem with Kramerman's argument is that the ALJ's statements are quite clearly supported by substantial evidence. Kramerman does, to at least some extent, cook meals, do laundry, wash dishes, make her bed, and even shop and drive. In the ALJ's view, the fact Kramerman did these activities undermined her testimony of marked restriction of even simple daily activities, and, in turn, her credibility.

It is important to note that the ALJ was not stating that Kramerman was not disabled because she could perform these activities.[7] Instead, the ALJ was saying that

---

[7]     As Kramerman notes, there is no requirement that a claimant's daily activities be objectively verified. [ECF No. 20, p. 19 (quoting *Wolfe v. Comm'r of Soc. Sec.*, Case No. 6:11-cv-1316-ORL-DAB, 2012 WL 3264912, at *6, n.2 (M.D. Fla. Aug. 10, 2012))]. But, the ALJ was not imposing such a requirement. He was simply basing his credibility determination, in part, on his finding that Kramerman's testimony and record evidence about her daily activities was fundamentally at odds with her testimony about the limiting effects of her alleged disability.

the fact Kramerman could perform these activities was at odds with her own statements about the limiting effect of her severe impairments. In the ALJ's view, this undermined Kramerman's credibility.

Kramerman also takes issue with the ALJ's finding that she made inconsistent statements to the SSA about her marital status, and that this undermined her credibility. [ECF No. 20, p. 17]. However, the record clearly evidences this finding. Kramerman's August 2010 Disability Report, prepared by the SSA, was based on a contemporaneous telephone interview. According to the Report, Kramerman "called back the next day and let us know that she had been lying about her marriage. She got married in 02/2010 and is still married. Told interviewer that she was engaged to be married in Sept 2010." (R. 141).

At the Hearing, the ALJ asked Kramerman about this, and she (and her husband) stated that while she was legally married in February 2010, she did not have a wedding ceremony until September 2010. (R. 47). Kramerman testified that she had no memory of calling the interviewer back the next day. (R. 50). The ALJ found that these facts generated  additional evidence to call Kramerman's credibility into question. (R. 25). In Kramerman's view, she explained to the ALJ the source of confusion (the different dates for her marriage and wedding ceremony) and "[a]ny inconsistency . . . is not a proper basis, in and of itself, to reject her testimony regarding the severity of her symptoms." [ECF No. 20, p. 20].

There are two problems with this argument. First, this was *not* the only basis for the ALJ's credibility determination. As described above, the ALJ also based his credibility determination on his view that Kramerman's stated limits were at odds with the medical evidence and her testimony about her own activities. The ALJ felt her functional limits were self-imposed, and that this undermined Kramerman's credibility -- the ALJ had support for this determination.

Second, Kramerman *did* make inconsistent statements about her marriage status. There is no dispute that Kramerman initially stated that she was not married in her disability application, submitted on August 12, 2010. (R. 136-38). There is also no dispute that Kramerman was actually married at that time. [ECF No. 20, p. 20]. The ALJ was entitled to draw his own conclusions about Kramerman's inconsistent statements about her marriage.

The Undersigned will not disturb the ALJ's credibility determination. The standard in this area is clear. In the Eleventh Circuit, a "clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (citing *MacGregor v. Bowen,* 786 F.2d 1050, 1054 (11th Cir. 1986)). In this case, the ALJ's credibility determination is supported by substantial evidence.

## IV.    CONCLUSION

For the reasons stated above, the Kramerman's summary judgment motion [ECF No. 20] is **denied**, the Commissioner's summary judgment motion [ECF No. 21] is **granted**, and the Clerk of the Court is directed to enter **final judgment** in favor of the Commissioner.

**DONE AND ORDERED**, in Chambers, in Miami, Florida, this 4th day of March, 2015.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
All Counsel of Record